FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 08, 2026

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| RS TITAN, LLC,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>PUBLIC UTILITY DISTRICT NO. 2 OF GRANT COUNTY; TERRY PYLE; LARRY SCHAAPMAN; JUDY WILSON; NELSON COX; TOM FLINT,<br><br>　　　　　Defendants. | No. 2:25-cv-00504-MKD<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS<br><br>**ECF No. 9** |

Before the Court is Defendants' Motion to Dismiss. ECF No. 9. The Court held a hearing on May 26, 2026. ECF No. 14. David Steele and Jonathan Hawley represented Plaintiff. John Cadagan and Mark Wilner represented Defendants. The Court has reviewed the motion and record, heard from counsel, and is fully informed. For the reasons explained below, the Court GRANTS in part and DENIES in part the motion.

## BACKGROUND

Plaintiff operates a data center at the Randolph Road facility in Moses Lake,

ORDER - 1

Washington.  ECF No. 7 at 2 ¶ 1.  The facility's electrical service is supplied by Defendant Grant County PUD, a municipal public utility district.  *Id.* at  6 ¶ 13. Plaintiff alleges that, for more than two decades, Plaintiff, its predecessors, and affiliates worked with Grant County PUD to expand Defendants' facilities and increase the electrical capacity available to the Randolph Road facility.  *Id.* at 7 ¶ 19.

Beginning in 2000, Plaintiff's predecessors and affiliates entered a series of agreements with Grant County PUD related to increased electrical service at the Randolph Road facility.  *Id.* at 7-9 ¶¶ 20-24.  In July 2000, Plaintiff's predecessor executed a Letter of Commitment agreeing to reimburse Defendants up to $1 million for design and procurement work needed to expand power to the facility. *Id.* at 7-8 ¶ 20.  In December 2002, Plaintiff's predecessor and Grant County PUD entered a Use of Facilities and Service Agreement under which Grant County PUD agreed to install and modify electrical infrastructure and Plaintiff's predecessor agreed to pay a monthly charge for use of the PUD's facilities.  *Id.* at 8 ¶ 21. Between 2005 and 2007, Plaintiff or its affiliates made additional facilities-cost payments to the PUD, including payments associated with additional increments of electrical service.  *Id.* at 8-9 ¶¶ 22-23.  Plaintiff alleges that, by the end of 2007, these payments totaled more than $1.9 million.  *Id*. at 9 ¶ 24.

On January 31, 2008, the parties entered a New Customer Agreement.  *Id.* at

ORDER - 2

9 ¶ 26. Plaintiff alleges that the 2008 Agreement consolidated and superseded the prior agreements. *Id.* Under the agreement, Grant PUD agreed to continue actions to expand or modify its electrical facilities and to use reasonable efforts to complete those actions so that it would be able to serve up to a maximum of 34.4 MVA of electrical service to the Randolph Road facility. *Id.* at 9-10 ¶ 27. Plaintiff was responsible for charges relating to the PUD's furnishing of electricity to the facility, as well as a monthly minimum payment. *Id.*

Plaintiff alleges that it relied on the 2008 Agreement and the PUD's prior commitments in acquiring and investing in the Randolph Road facility. *Id.* at 10 ¶ 28. Plaintiff further alleges that, in 2009, it deeded land to Grant County PUD to facilitate construction of substations and related infrastructure needed to serve increased load at the facility. *Id.* at 10-11 ¶ 29. Plaintiff also alleges that Grant County PUD later confirmed the anticipated capacity: in 2009, it allegedly stated that it intended to provide Plaintiff adequate capacity as Plaintiff's need developed "up to what has been paid for," and in 2019, it allegedly confirmed that it had the capability to meet approximately 34 MVA at the Randolph Road facility. *Id.* at 11 ¶¶ 30-32.

In late 2024 and 2025, Defendants adopted and applied new load-limit policies. Plaintiff alleges that Defendants adopted Resolution 9074 in December 2024, giving the PUD authority to set and enforce load limits, and later adopted

ORDER - 3

Resolution 9098 in August 2025 as part of its Customer Service Policies.  During that same period, Defendants sent Plaintiff letters stating that Plaintiff's allowable load at the Randolph Road facility would be limited to 9.2 MW.  Plaintiff alleges that it demanded Defendants honor the 34.4 MVA level of service, but Defendants did not do so.  *Id.* at 12 ¶¶ 35-38.

Separately, in August 2023, Plaintiff submitted a large-power application to Defendants seeking an additional 41 MVA of electrical service for the Randolph Road facility, beyond the 34.4 MVA Plaintiff alleges it was already entitled to receive.  *Id.* at 13 ¶ 41.  Plaintiff paid the then-required $21,000 nonrefundable application fee.  *Id.*  Plaintiff alleges that this payment placed its application in Defendants' large electric service queue.  *Id.* at 13-14 ¶ 42.  After submitting the application, Plaintiff followed up with Defendants about timing and alleges it was told that there were long delays, that no action was required from Plaintiff, and that Plaintiff could continue checking in.  *Id.* at 14 ¶ 43.

In September 2025, the PUD informed Plaintiff that it had updated its large-power application fee schedule effective September 1, 2025, and that existing applications in the queue without a Facilities Construction Agreement would be subject to the updated fee structure.  *Id.* at 14-15 ¶ 44.  For Plaintiff's 41 MVA request, the PUD assessed a total application fee of $1,640,000.  *Id.* at 15 ¶ 45.  After crediting Plaintiff's prior $21,000 payment, the PUD required Plaintiff to pay

ORDER - 4

an additional $1,619,000. *Id.* The PUD's communication stated that if Plaintiff did not timely respond or pay, its application would be deemed forfeited and cancelled, and reapplication would require starting at the end of the queue. *Id.* at 16 ¶ 48. Plaintiff responded that it wished to remain in the queue with no change to its requested load and was later billed the outstanding balance. *Id.* at 16 ¶¶ 49-50.

## LEGAL STANDARD

"To survive a [Fed. R. Civ. P. 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In considering a motion to dismiss for failure to state a claim, the Court must accept as true the well-pleaded factual allegations and any reasonable inference to be drawn from them, but legal conclusions are not entitled to the same assumption of truth. *Id.* A complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory. *Twombly*, 550 U.S. at 562. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555.

ORDER - 5

**DISCUSSION**

Defendants move to dismiss all claims asserted in Plaintiff's First Amended Complaint.  As discussed below, the Court dismisses the official capacity claims against the individual Commissioners as redundant, dismisses Plaintiff's federal and state due process claims, and otherwise denies the motion.

**A. Official Capacity Claims**

Defendants move to dismiss the claims against the Commissioners as redundant because Grant County PUD itself is named as a defendant.  An official capacity claim is treated as a claim against the entity itself.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  "When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant." *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008)

Plaintiff argues the Commissioners were properly named because Plaintiff seeks prospective declaratory and injunctive relief.  However, Plaintiff need not rely on an official capacity suit to obtain prospective relief against an otherwise immune state entity.  The PUD is a municipal corporation, and municipal corporations do not share the States' Eleventh Amendment immunity.  *Alden v. Maine*, 527 U.S. 706, 756 (1999) ("[Sovereign immunity] does not extend to suits prosecuted against a municipal corporation or other governmental entity which is

ORDER - 6

not an arm of the State.").  Local government units may be sued directly for damages, injunctive relief, and declaratory relief.  *See Graham*, 473 U.S. at 167 n.14.  The Court thus dismisses all claims asserted against the Commissioners in their official capacities.

**B. Breach of Contract**

Defendants move to dismiss Plaintiff's breach of contract claim.  To sufficiently plead breach of contract, Plaintiff must allege: (1) the existence of a valid contract; (2) breach of that contract; and (3) resulting damages. *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995).  The necessary elements of contract formation are: (1) offer; (2) acceptance; (3) competent parties; (4) legal subject matter; and (5) consideration.  *Lager v. Berggren,* 60 P.2d 99, 101 (Wash. 1936).  "Under Washington law, a contract requires mutual assent to its essential terms in order to be binding." *Lee v. Intelius Inc.*, 737 F.3d 1254, 1259 (9th Cir. 2013).  To sufficiently allege breach, Plaintiff must allege the PUD failed to perform a contractual duty.  *Nw. Indep. Forest Mfrs.*, 899 P.2d at 9.

> Under Washington law, contracts are interpreted in accordance with the context rule.  Under the context rule, extrinsic evidence is admissible to assist the court in ascertaining the parties' intent and in interpreting the contract.  The court may consider (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing

ORDER - 7

between the parties.  Such evidence is admissible regardless of whether the contract language is deemed ambiguous, though extrinsic evidence cannot be considered: (a) to show a party's unilateral or subjective intent as to the meaning of a contract word or term; (b) to show an intention independent of the instrument; or (c) to vary, contradict, or modify the written word.

*Washington State Republican Party v. Washington State Grange*, 676 F.3d 784, 796 (9th Cir. 2012) (simplified).

The Court analyzes this claim in two parts, consistent with how the claim is treated in both the amended complaint and the parties' briefing.  Plaintiff first alleges that the 2008 Agreement obligated the PUD to provide 34.4 MVA of electrical service to the Randolph Road facility and that the PUD breached by limiting Plaintiff to 9.2 MW.  Plaintiff separately alleges that the 2023 large-power application created an enforceable agreement because Plaintiff paid the required $21,000 fee in exchange for application processing and a secure place in the queue, and that the PUD breached by threatening to remove Plaintiff from the queue unless Plaintiff paid an additional $1.619 million.

*1. 2008 Agreement*

Plaintiff plausibly states a breach of contract claim based on the 2008 Agreement.  Defendants argue the contract did not promise delivery or reservation of 34.4 MVA.  In their view, the relevant clause required only that the PUD use reasonable efforts to expand or modify facilities so the PUD would be able to serve "up to a maximum of 34.4 MVA."  Defendants emphasize that the agreement does

ORDER - 8

not identify a delivery date, duration, exclusive reservation, or fixed obligation to supply 34.4 MVA on demand.

Those points may ultimately narrow Plaintiff's contract theory, but they do not defeat the claim at the pleading stage. Plaintiff alleges a valid 2008 Agreement, its performance, Defendant's obligation to make capacity up to 34.4 MVA available, and breach through the later 9.2 MW limit. The written agreement at least contains a reasonable-efforts obligation tied to the PUD's ability to serve up to 34.4 MVA. Plaintiff alleges that the PUD later imposed a 9.2 MW cap, refused to provide the 34.4 MVA level of service, and refused to acknowledge the alleged contractual obligation. Those allegations are sufficient to plead breach of a capacity-related obligation under the 2008 Agreement.

The incorporated Customer Service Policies and Rate Schedules do not defeat the claim at this stage. Defendants argue those policies, including later amendments, govern the amount and conditions of electrical service. But Plaintiff responds that general service policies cannot be read on the pleadings to nullify the alleged specific obligation in the 2008 Agreement. Washington contract law generally favors harmonizing provisions where possible and avoiding interpretations that render obligations illusory. *See, e.g.*, *Nishikawa v. U.S. Eagle High, LLC*, 158 P.3d 1265, 1268 (Wash. Ct. App. 2007) (citations omitted).

ORDER - 9

While the 2009 and 2019 communications do not independently rewrite the agreement, they may be relevant under Washington's context rule to the extent they illuminate the parties' objective understanding of the contract language. Plaintiff alleges the PUD stated in 2009 that it intended to provide capacity "up to what has been paid for" and later confirmed in 2019 that it had capability to meet approximately 34 MVA at the Randolph Road facility. Defendants argue those statements are consistent with facilities capability only, not a guaranteed delivery or reservation obligation. That dispute reinforces that the Court should not resolve the parties' competing interpretations unless the contract unambiguously forecloses Plaintiff's theory. Because it does not, the Court declines to dismiss this claim.

*2. 2023 Application*

Plaintiff also plausibly states a breach of contract claim based on the 2023 application, although the Court acknowledges this claim is narrower than Plaintiff's 2008 Agreement theory. Plaintiff alleges that it submitted a large-power application for an additional 41 MVA, paid the required $21,000 application fee, and thereby secured a place in the PUD's large electric service queue. Plaintiff further alleges that the PUD later imposed a new $1.64 million fee, credited Plaintiff's prior $21,000 payment, and threatened that nonpayment of the remaining $1.619 million would result in forfeiture, cancellation, and reapplication at the end of the queue.

ORDER - 10

Defendants argue the application documents defeat any contract theory because the application contemplated only preliminary estimates, stated the fee did not cover "studies & scope," and provided that additional agreements would follow.  That argument is persuasive to the extent Plaintiff seeks to plead that the $21,000 fee entitled it to complete processing, construction, or delivery of the additional 41 MVA without further costs.  The application language does not plausibly support that broad theory.

But Plaintiff's claim can be read more narrowly and plausibly: the $21,000 fee secured an application status and queue position under the rules then in effect.  Plaintiff does not need to plausibly plead that the application guaranteed final service.  It needs to plausibly plead a contractual duty that the PUD allegedly breached.  The FAC alleges the PUD's own policies placed completed large-power applications into the large electric service queue, that Plaintiff paid the fee required for that placement, and that the PUD later threatened cancellation and reapplication at the end of the queue if Plaintiff did not pay the new fee.  That alleged forfeiture language supports the inference that Plaintiff had a queue position or application status capable of being lost.

Defendants rely on Fee Schedule language stating that fees are set by the Commission and subject to change, arguing the revised fee applies generally to large-power applicants.  That argument does not resolve Plaintiff's narrower theory

ORDER - 11

at the pleading stage.  Plaintiff does not maintain that the PUD can never change fees or charge for future studies, scope, or facilities work.  Rather, Plaintiff argues that the PUD could not impose a new, materially larger application fee on an existing queued applicant as a condition of preserving the queue position allegedly obtained by paying the earlier required fee.  Although the application documents contemplate future studies, scope work, and additional agreements, they do not conclusively defeat Plaintiff's narrower allegation that the original fee secured a queue position and that the PUD later breached by conditioning retention of that position on payment of the new fee.  The application's references to preliminary estimates, studies, and additional agreements may limit the scope of the alleged contract, but they do not necessarily eliminate the alleged bargain that Plaintiff paid $21,000 to obtain and maintain a place in the large-power queue absent a valid basis for forfeiture.  The PUD's later demand that Plaintiff pay $1.619 million or lose its queue position is the alleged breach.  The Court therefore permits Count 1 to proceed on this narrower queue-position theory.

**C. Promissory Estoppel and Unjust Enrichment**

Defendants move to dismiss Plaintiff's promissory estoppel and unjust enrichment claims.  Counts 2 and 4 are addressed together because both are equitable theories pleaded in the alternative to Plaintiff's contract claims.  "To obtain recovery in promissory estoppel, plaintiff must establish (1) a promise

ORDER - 12

which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise." *Havens v. C & D Plastics, Inc.*, 876 P.2d 435, 442 (Wash. 1994) (simplified). The "elements of a contract implied in law"—or unjust enrichment—"are: (1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008).

Defendants argue both claims fail because express written agreements govern the parties' relationship. That argument does not require dismissal at the pleading stage. Under Washington law, promissory estoppel generally may not displace an enforceable contract governing the same promise and unjust enrichment is ordinarily unavailable where a valid express contract governs the same subject matter. However, those rules generally prevent duplicative recovery or equitable relief that contradicts an enforceable contract and do not bar Plaintiff from alternatively pleading where the scope, meaning, or enforceability of the alleged contractual obligations remains disputed. This is appropriate here because Defendants dispute that the written documents impose the obligations Plaintiff seeks to enforce.

ORDER - 13

For promissory estoppel, Plaintiff alleges the PUD promised that it would provide the Randolph Road facility with 34.4 MVA and that payment of the $21,000 application fee would secure a place in the large-power queue.  Plaintiff further alleges it reasonably relied on those promises by entering customer contracts, making facility investments, providing payments and property to the PUD, and paying the application fee.  Those allegations are enough if pleaded in the alternative.  The claim may later fail if the Court determines that enforceable written agreements govern the same promises, or that the alleged promises were not sufficiently clear and definite.  Dismissal now, however, would be premature while Defendants simultaneously dispute that the written documents contain the obligations Plaintiff seeks to enforce.

For unjust enrichment, Plaintiff alleges the PUD retained substantial benefits, including more than $1.9 million in payments, real property, and the $21,000 application fee, while refusing to provide the promised capacity and threatening to remove Plaintiff from the queue.  If the express agreements govern those benefits and provide an adequate remedy, unjust enrichment will not provide separate relief.  But because Defendants dispute the scope of the alleged contracts, Plaintiff may plead unjust enrichment in the alternative at this stage to prevent the PUD from retaining benefits without providing the corresponding alleged consideration.

ORDER - 14

**D. Breach of Implied Duty of Good Faith and Fair Dealing**

Defendants move to dismiss Plaintiff's breach of implied duty of good faith and fair dealing claim. "There is in every contract an implied duty of good faith and fair dealing. This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991) (citations omitted). The duty applies only in relation to performance of a specific contract term; it does not create a free-floating obligation of good faith, require a party to accept new substantive duties, or "inject substantive terms into the parties' contract." *Id.* "[T]he duty of good faith and fair dealing arises when the contract gives one party discretionary authority to determine a contract term." *Rekhter v. State, Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014) (simplified).

Plaintiff alleges the PUD breached the implied duty of good faith and fair dealing in connection with both the 2008 Agreement and the 2023 application. As with the breach of contract claim, this claim is analyzed in two parts.

*1. 2008 Agreement*

Plaintiff plausibly states an implied-duty claim based on the 2008 Agreement. Plaintiff alleges the agreement required the PUD to use reasonable efforts to expand or modify its facilities so that it would be able to serve up to 34.4 MVA at the Randolph Road facility. Plaintiff further alleges that, rather than using

ORDER - 15

reasonable efforts or cooperating so Plaintiff could receive the benefit of that bargain, the PUD unreasonably delayed performance, adopted a load-limit policy, limited Plaintiff to 9.2 MW, and refused to acknowledge the alleged contractual obligation.

Defendants argue the claim fails because the implied duty cannot create a contractual obligation to deliver 34.4 MVA if the 2008 Agreement does not contain one.  While Plaintiff cannot use Count 3 to add a delivery obligation that the contract does not otherwise support, its implied duty theory is not limited to adding a new term.  The 2008 Agreement itself contains a "reasonable efforts" obligation and incorporates policies that Defendants say govern service conditions. To the extent those provisions gave the PUD discretion in how to perform, expand facilities, apply policies, or administer load limits, Plaintiff plausibly alleges the PUD exercised that discretion in a way that deprived Plaintiff of the benefit of the agreement.

Because the underlying contract claim survives, the Court declines to dismiss this claim.  Plaintiff has plausibly pleaded a contractual capacity-related obligation under the 2008 Agreement, as discussed above, and has also plausibly pleaded that the PUD failed to cooperate in good faith with performance of that obligation.  The Court does not hold that the implied duty creates any obligation independent of the 2008 Agreement.

ORDER - 16

*2.  2023 Application*

Plaintiff's implied duty theory based on the 2023 application is narrower but also plausibly stated at the pleading stage.  Plaintiff alleges the PUD accepted the $21,000 application fee in exchange for application processing and a place in the large-power queue, then exercised its fee-setting or queue-management authority to require an additional $1.619 million as a condition of preserving that position.

Defendants respond that the application expressly contemplated preliminary estimates, studies and scope, and additional agreements, so the implied duty cannot eliminate the PUD's authority to require additional fees or agreements. Defendants are correct that the implied duty cannot rewrite the application into a guarantee of full processing or delivery of the additional 41 MVA for only $21,000.  But if Plaintiff plausibly alleges that the application fee secured at least a queue-related contractual interest, then the implied duty may constrain the PUD's discretion in administering that interest.

The key distinction is between future fees for future work and a new fee imposed as a condition of avoiding forfeiture of an allegedly existing queue position.  Plaintiff's theory is that the PUD used its discretion over fees and queue management to deprive Plaintiff of the benefit it allegedly obtained by paying the original application fee.  Because Plaintiff's 2023 application-based breach of

ORDER - 17

contract claim survives dismissal on that narrower queue-position theory, the implied duty claim based on the same alleged contractual interest also survives.

### E. Federal Substantive Due Process

Defendants move to dismiss Plaintiff's federal substantive due process claim. Plaintiff asserts a federal substantive due process claim based on the allegation that the PUD retroactively used later policies to repudiate vested contractual rights—specifically, Plaintiff's alleged right to 34.4 MVA under the 2008 Agreement and its alleged right to maintain its 2023 application/queue position based on the $21,000 application fee.

The threshold question is whether Plaintiff has plausibly alleged a constitutionally protected property interest. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). To state a federal substantive due process claim, Plaintiff must plausibly allege that the PUD deprived it of such a constitutionally protected property interest. *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008).

ORDER - 18

In the public-contract context, the existence of a contract right does not automatically create a substantive due process claim.  The Supreme Court has explained that where a contractor's claim is for payment allegedly due under a public contract, the availability of ordinary contract remedies generally satisfies due process.  *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001).  "Upon a careful reading of *Lujan,* it appears that the common law breach of contract claim provides adequate process for the deprivation of a property right derived from a contract, unless the deprivation constitutes a denial of a present entitlement."  *DeBoer v. Pennington*, 287 F.3d 748, 749 (9th Cir. 2002) (cautioning that a government breach of contract does not itself become a constitutional deprivation where the asserted interest is "fully protected by an ordinary breach-of-contract suit").

Although Plaintiff has plausibly alleged contract rights, it has not plausibly alleged a constitutionally protected property interest distinct from those disputed contractual rights and ordinary contract remedies.  As to the 2008 Agreement, the alleged right is framed through "reasonable efforts" and the ability to serve "up to" a maximum level of electrical service.  That may support a breach of contract claim, but it is not a clearly vested entitlement to immediate delivery or reservation of 34.4 MVA.  As to the 2023 application, the asserted entitlement is even less

ORDER - 19

definite because the application documents contemplate preliminary estimates, studies and scope, and additional agreements.

The gravamen of Plaintiff's substantive due process claim is that the PUD used later governmental action to impair earlier contractual obligations. That theory sounds more directly in the Contract Clause, which specifically governs laws impairing contractual obligations. Federal substantive due process does not extend to every disputed public-contract entitlement, particularly where, as here, a plaintiff has ordinary contract remedies and has separately pleaded Contract Clause claims. The Court thus dismisses this claim. Dismissal of this claim, however, does not foreclose Plaintiff's theory that later PUD policies impaired alleged contractual obligations. That theory is addressed under the Contract Clause claims, as discussed below.

**F. Washington Due Process**

Defendants move to dismiss Plaintiff's Washington Constitution-based due process claim. This claim is similarly based on Plaintiff's allegation that the PUD retroactively used later policies to repudiate vested contractual rights. Those alleged rights are Plaintiff's asserted right to 34.4 MVA under the 2008 Agreement and its asserted right to maintain its 2023 application/queue position after paying the $21,000 application fee.

ORDER - 20

Article I, Section 3 of the Washington Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." Washington courts have recognized that due process may be violated when a law is applied retroactively to deprive a party of a vested right. *In re Marriage of MacDonald*, 709 P.2d 1196, 1199 (Wash. 1985). A vested right must be more than a mere expectation. *Id.*

Plaintiff relies on *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 869 P.2d 28 (1994), where the Washington Supreme Court held that the parties' provider agreements created contractual reimbursement obligations. *Id.* at 35-36. The court further held that the plaintiff had a vested right to reimbursement because it had already performed services under contracts that incorporated a specific reimbursement formula. *Id.* at 42. The right was not merely prospective or contingent. The plaintiff had already performed under a defined contractual reimbursement scheme before the later statutory change attempted to reduce payment for that completed performance. *Id.*

Plaintiff's alleged rights are different. As to the 2008 Agreement, Plaintiff plausibly alleges a contractual duty, but that duty is framed in terms of "reasonable efforts" and the PUD's ability to serve "up to" a maximum level of electrical service. That language may support a breach of contract claim, but it does not establish the kind of fixed, accrued entitlement at issue in *Caritas*. As to the 2023

ORDER - 21

application, the alleged right is even less definite because the application process contemplated preliminary estimates, studies and scope, and additional agreements. Washington due process protects vested rights from retroactive deprivation, but Plaintiff has alleged disputed contractual interests rather than an accrued or fixed vested right comparable to *Caritas*. The Court thus dismisses this claim. This dismissal does not foreclose Plaintiff's separate theory that later PUD policies impaired alleged contractual obligations under the Washington Contract Clause.

**G. Federal Contract Clause**

Defendants move to dismiss Plaintiff's federal Contract Clause claim. Plaintiff alleges the PUD had two contractual relationships with Plaintiff: (1) the 2008 Agreement, under which the PUD allegedly promised to use reasonable efforts to expand or modify facilities so that it would be able to serve the Randolph Road facility with up to 34.4 MVA; and (2) the 2023 application, under which Plaintiff allegedly paid the $21,000 application fee in exchange for processing and a secure place in the large-power queue. Plaintiff alleges the PUD substantially impaired those contractual relationships by later applying new load-limit policies and the revised fee schedule.

The Contract Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The analysis asks: first, whether a contractual relationship exists; second, whether a change in

ORDER - 22

law substantially impairs that contractual relationship; and third, whether the impairment is justified. *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-13 (1983).

> The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.

*U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 25-26 (1977) (footnotes omitted).

Defendants argue this claim fails because Plaintiff has not plausibly alleged any contract that was impaired. Their argument tracks their breach of contract arguments: the 2008 Agreement allegedly did not guarantee delivery or reservation of 34.4 MVA, and the 2023 application allegedly did not secure a queue position immune from later fees. Defendants also argue there was no impairment because the 2008 Agreement incorporated the PUD's Customer Service Policies and Rate Schedules, including later amendments. In their view, the load-limit policies and fee schedule were part of the contractual framework, not later laws impairing independent contractual obligations.

ORDER - 23

Plaintiff responds that it has plausibly alleged existing contractual relationships and that the PUD used later policies to rewrite or avoid those commitments.  As to the 2008 Agreement, Plaintiff alleges the PUD accepted substantial consideration and then later adopted load-limit authority that reduced Plaintiff's available load to 9.2 MW, despite the alleged 34.4 MVA obligation.  As to the 2023 application, Plaintiff alleges the PUD accepted the $21,000 fee, placed Plaintiff in the queue, and then retroactively imposed a $1.619 million payment condition to preserve that position.

The key issue is whether the challenged PUD actions are merely alleged breaches of contract, or whether they are legislative or policy actions that impaired contractual obligations.  That distinction matters because not every public-contract breach is a Contract Clause violation.  The Ninth Circuit has explained that the Contract Clause is implicated where the later law has the legal effect of altering or eliminating contractual obligations, but not where the government remains subject to ordinary contract remedies and the dispute is simply whether the government breached.  *Pure Wafer Inc. v. City of Prescott*, 845 F.3d 943, 952-53 (9th Cir. 2017).

The Contract Clause claim presents a close question, but at the pleading stage Plaintiff alleges the later policies did more than accompany a breach. Plaintiff alleges the later policies provided the asserted legal basis for the PUD to

ORDER - 24

avoid the alleged contractual obligations altogether.  Plaintiff alleges the PUD adopted and applied new policies—load-limit authority and a revised fee schedule—to defeat or materially alter preexisting contractual rights.  Defendants may ultimately show that the later policies were incorporated into the agreements from the outset, that the PUD did not impair any independent obligation, or that any impairment was reasonable and necessary to serve important public purposes such as grid reliability, resource planning, and infrastructure funding.  But those arguments depend on the scope of the underlying contracts and the legal effect of the later policies, issues not conclusively resolved on a motion to dismiss.

Because Plaintiff plausibly alleges a contractual capacity-related obligation under the 2008 Agreement, it also plausibly alleges that later load-limit policies impaired that alleged obligation.  The 2023 application-based theory is closer, but it also survives because Plaintiff plausibly alleges that the $21,000 fee secured at least a queue-related contractual interest and that the later fee schedule impaired that interest by conditioning preservation of the queue position on a new $1.619 million payment.  Defendants' arguments about future studies, additional agreements, and fee-change discretion may narrow or defeat the claim later, but they do not conclusively defeat the alleged impairment at this stage.

**H. Washington Contract Clause**

Defendants move to dismiss Plaintiff's Washington Constitution Contract

ORDER - 25

Clause claim.  Plaintiff alleges the PUD violated Article I, Section 23 of the Washington Constitution, which provides that "[n]o . . . law impairing the obligations of contracts shall ever be passed."  Plaintiff bases this claim on the same two alleged contractual relationships: the 2008 Agreement and the 2023 application/queue-position agreement.  Plaintiff alleges the PUD substantially impaired those agreements by later applying new load-limit policies and a revised large-power fee schedule.

> The test for analyzing impairment of public contracts has three parts.  First, the court must determine whether a contractual relationship exists; second, the court must determine whether the legislation substantially impairs the contractual relationship; third, when a state impairs its own contracts, the court must determine if the impairment was reasonable and necessary to serve a legitimate public purpose.

*Caritas Servs.*, 869 P.2d at 35 (citations omitted).

Defendants' arguments largely mirror their federal Contract Clause arguments.  They contend Plaintiff has not plausibly alleged a contractual relationship that was impaired because the 2008 Agreement did not guarantee delivery or reservation of 34.4 MVA, and the 2023 application did not secure a queue position immune from later fees.  Defendants also argue the challenged policies were incorporated into the contractual framework through the Customer Service Policies and Rate Schedules, including later amendments, so there was no later legislative impairment of an independent contractual obligation.

ORDER - 26

Plaintiff responds that the PUD cannot accept consideration, enter agreements, and then use later policy changes to avoid its own commitments.  As to the 2008 Agreement, Plaintiff alleges the PUD accepted more than $1.9 million and land contributions, then later adopted load-limit authority and capped Plaintiff at 9.2 MW despite the alleged 34.4 MVA obligation.  As to the 2023 application, Plaintiff alleges the PUD accepted the $21,000 fee and placed Plaintiff in the queue, then later applied a new fee schedule requiring $1.619 million to preserve that position.

Plaintiff's Washington Contract Clause claim survives for the same reasons as its federal Contract Clause claim.  *See Caritas Servs.*, 869 P.2d at 35 (relying on federal Contract Clause jurisprudence).  If Plaintiff has plausibly alleged contractual obligations under the 2008 Agreement and the 2023 application, it has also plausibly alleged that later PUD policies impaired those alleged obligations.  The PUD may ultimately show that the incorporated policies allowed the challenged actions, that there was no substantial impairment, or that any impairment was reasonable and necessary to serve legitimate utility purposes.  But those questions turn on the scope of the contractual relationships and the effect of the later PUD actions—issues not properly resolved at this stage.

**I.  Arbitrary and Capricious Action**

Defendants move to dismiss Plaintiff's arbitrary and capricious action claim.

ORDER - 27

Plaintiff alleges the PUD acted arbitrarily, capriciously, and unreasonably in two respects: first, by disregarding the parties' longstanding relationship and limiting Plaintiff to 9.2 MW despite the alleged 34.4 MVA obligation; and second, by retroactively applying the revised large-power application fee schedule to Plaintiff's existing 41 MVA application.

Washington law affords municipal utilities substantial discretion in exercising their proprietary powers, but that discretion remains subject to review for arbitrary, capricious, or unreasonable action.  "[W]e have traditionally allowed municipal corporations discretion in exercising their proprietary powers so long as their actions are not arbitrary, capricious or unreasonable: if municipal utility actions come within the purpose and object of the enabling statute and no express limitations apply, this court leaves the choice of means used in operating the utility to the discretion of municipal authorities.  We limit judicial review of municipal utility choices to whether the particular contract or action was arbitrary or capricious or unreasonable." *Hite v. Pub. Util. Dist. No. 2*, 772 P.2d 481, 485 (Wash. 1989) (simplified).  "This is an extremely deferential standard of review. Arbitrary and capricious refers to willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be

ORDER - 28

erroneous." *Pub. Util. Dist. No. 2 of Pac. Cnty. v. Comcast of Washington IV, Inc.*, 438 P.3d 1212, 1225 (Wash. Ct. App. 2019) (simplified).

Defendants argue this claim fails because the FAC itself identifies rational reasons for the challenged actions. As to the load-limit policy, Defendants point to system reliability and safe operation of the electrical system. As to the revised large-power fee, Defendants point to the PUD's stated goals of securing additional energy resources, funding significant transmission infrastructure, and distinguishing speculative interest from firm demand. Defendants therefore contend the challenged policies are rational utility-management decisions, not arbitrary or capricious conduct.

Plaintiff responds that the issue cannot be resolved on the pleadings because the FAC alleges the PUD acted without adequate consideration of Plaintiff's particular circumstances. As to the 34.4 MVA issue, Plaintiff alleges the PUD ignored the 2008 Agreement, Plaintiff's payments and property contributions, and the PUD's alleged later assurances. As to the 2023 application, Plaintiff alleges the PUD imposed a massive new application fee on existing applicants even though the stated policy goals could have been addressed through prospective fee changes or later charges for actual studies, scope, and construction costs.

While the PUD's stated rationales may ultimately defeat the claim on the merits, particularly given the deference owed to municipal utility decision-making,

ORDER - 29

at this stage Plaintiff does plausibly allege willful and unreasoning action or action taken without regard to relevant facts and circumstances. Plaintiff alleges the PUD imposed the 9.2 MW limit and the revised fee without adequately considering Plaintiff's alleged existing contractual rights, prior contributions, and queue status. On this record, that is sufficient.

## CONCLUSION

For the reasons discussed above, Defendants' motion is granted in part and denied in part.

Accordingly, **IT IS HEREBY ORDERED:**

1. Defendants' Motion to Dismiss, **ECF No. 9**, is **GRANTED in part and DENIED in part**. The motion is GRANTED as to all claims asserted against Defendants Terry Pyle, Larry Schaapman, Judy Wilson, Nelson Cox, and Tom Flint, and those Defendants are DISMISSED. The motion is also GRANTED as to Counts 5 and 6, which are DISMISSED. The motion is otherwise DENIED as to Counts 1, 2, 3, 4, 7, 8, and 9 asserted against Defendant Public Utility District No. 2 of Grant County.

**IT IS SO ORDERED.** The District Court Clerk is directed to enter this Order and provide copies to counsel.

ORDER - 30

DATED June 7, 2026.

<u>*s/Mary K. Dimke*</u>
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE

ORDER - 31